IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA14-1021

 Filed: 19 April 2016

Durham County, Nos. 92 CRS 28439, 25350, 28352

STATE OF NORTH CAROLINA

 v.

DARRYL ANTHONY HOWARD

 Appeal by the State from order entered 27 May 2014 by Judge Orlando F.

Hudson, Jr. in Durham County Superior Court. Heard in the Court of Appeals 8 April

2015.

 Attorney General Roy Cooper, by Assistant Attorney General Mary Carla Babb,
 for the State.

 Womble Carlyle Sandridge & Rice, LLP, by James P. Cooney III, and Innocence
 Project, by Barry Scheck and Seema Saifee (both admitted pro hac vice), for
 defendant.

 CALABRIA, Judge.

 The State appeals from the trial court’s order granting defendant’s motion for

appropriate relief (“MAR”) on the basis of newly discovered evidence pursuant to N.C.

Gen. Stat. § 15A-1415(b)(3), “favorable” post-conviction DNA results pursuant to N.C.

Gen. Stat. § 15A-270(c), and violations of the U.S. Constitution. For the reasons that

follow, we vacate the trial court’s order and remand for an evidentiary hearing.
 STATE V. HOWARD

 Opinion of the Court

 I. Background

 The factual genesis of this case was the 27 November 1991 murders of Doris

Washington (“Doris”) and her thirteen-year-old daughter, Nishonda Washington

(“Nishonda”). Approximately one year after the murders, Darryl Anthony Howard

(“defendant”) was arrested and indicted on two counts of first degree murder and one

count of first degree arson. At defendant’s trial in March 1995, both first degree

murder charges were reduced to second degree murder. The jury found defendant

guilty of both murders and the associated arson. Defendant received an eighty-year

sentence, which he appealed. This Court concluded that his trial was free from error.

See State v. Howard, 122 N.C. App. 754, 476 S.E.2d 147 (1996), No. COA95-1156, WL

34899110, at *1, disc. review denied, 347 N.C. 272, 493 S.E.2d 755 (1997). The

evidence presented by the State at defendant’s 1995 trial established the following

facts.

 Shortly after 1:00 a.m. on 27 November 1991, the Durham Fire Department

responded to a call regarding an apartment fire in Few Gardens, a Durham public

housing community. Shortly after Durham Firefighter Robert Wesley McLaughlin,

Jr. ascended to the smoke-filled apartment’s second floor, he discovered the nude

bodies of Doris and Nishonda lying face down on a bed in the front bedroom. The fire

had been intentionally set in a closet located in the rear upstairs bedroom.

 -2-
 STATE V. HOWARD

 Opinion of the Court

 Eric Campin (“Campin”), a crime scene technician with the Durham Police

Department (“DPD”), arrived at the crime scene around 7:00 a.m. During his

investigation, Campin observed a console TV sitting on the apartment’s lower level

floor. The TV had been pulled away from the wall, and cable or VCR wires lay on the

floor beside it. After Campin observed a dust pattern on top of the TV, which in his

experience was an indication of theft, he surmised that a VCR or similar appliance

was missing.

 Doris and Nishonda’s autopsies were performed at approximately 10:30 a.m.

on 27 November 1991. Dr. Robert L. Thompson, a forensic pathologist, testified

regarding the results, which revealed that Nishonda died from ligature

strangulation. While certain evidence suggested that Doris was also strangled, it was

determined that she had died from a “blunt force injury to [her] abdomen which

caused extensive internal bleeding.” Both Nishonda and Doris died before the

apartment caught fire.

 Sexual assault kits (“rape kits”) were collected from Doris and Nishonda, a

routine occurrence when a victim “has obviously [been sexually assaulted] or [there

is] a possibility of having been sexually assaulted.” Dr. Thompson discovered “a

moderate number of well[-]preserved” sperm heads in Nishonda’s anal cavity, and

subsequent testing of Nishonda’s rape kit also detected sperm on her vaginal smears.

DNA analysis excluded defendant as a source of the sperm found in Nishonda’s

 -3-
 STATE V. HOWARD

 Opinion of the Court

vagina and anus. Doris’ vagina was torn (one-half inch laceration) and contained a

small amount of blood-tinged fluid, but no sperm was detected in any of her body

cavities or in her rape kit. Dr. Thompson determined that Doris’ vagina was torn

around the time of her death and that “something had to be placed inside [it] . . . some

pressure put on it to cause that tear.” He also determined that Doris had ingested

cocaine “fairly recent[ly]” prior to her death.

 Roneka Jackson (“Jackson”), a Few Gardens resident who knew Doris,

Nishonda, and defendant, testified that Doris used and sometimes sold cocaine.

According to Jackson, during the afternoon of 26 November 1991, defendant went to

Doris’ apartment in search of his girlfriend, but Doris would not let him inside. An

argument ensued, and before defendant left, he said to Doris, “I am going to kill you

and your daughter.” Around 10:00 p.m. that evening, Jackson saw defendant and his

brother, Bruce, walking out of Doris’ back door carrying a television. After setting

the television in his car, defendant placed a three or four minute phone call from a

public telephone and then drove away with his brother. Jackson then noticed smoke

coming from a back window of Doris’ apartment; fire trucks arrived approximately

fifteen minutes later.

 Rhonda Davis (“Davis”) was at Doris’ apartment getting high on cocaine from

approximately 10:30 a.m. to 10:30 p.m. on 26 November 1991. To the best of Davis’

knowledge, Doris did not sell cocaine but she did allow a group of dealers from Miami

 -4-
 STATE V. HOWARD

 Opinion of the Court

and another from New York1 to sell drugs from her apartment. After Nishonda went

to bed around 10:30 p.m., Davis and Doris left the apartment for a short while and

split up. Hoping to buy some cocaine, Davis returned to Doris’ apartment around

midnight and knocked on the back door. After approximately five minutes, defendant

appeared at the window and told Davis that he and Doris were “busy.” Davis then

“heard some dishes rattling in the sink or something.” After walking around to the

front door, Davis “heard somebody going up the steps.” Davis then left.

 Few Gardens resident Terry Suggs (“Suggs”) saw smoke coming from Doris’

apartment sometime after midnight on 27 November 1991. A few minutes before

seeing the smoke, Suggs saw defendant and a female walking through the gap

between Doris’ apartment building and the adjacent building.

 Around midnight on 27 November 1991, Kevin Best (“Best”) and Dwight Moss

(“Moss”) were standing across from Doris’ apartment. According to Best, defendant

and another male—who Moss claimed was defendant’s brother, Kenny—exited the

back door of Doris’ apartment carrying a television and a VCR. “[N]o more than [ten]

minutes” later, Best saw smoke coming from Doris’ apartment window.

 Moss had heard that Doris sold drugs for a person he referred to as “the New

York Boy.” According to Moss, defendant “hung around” with the New York Boys and

 1 Testimony at trial indicated that a gang of teen-age drug dealers known as the “New York
Boys” operated in Few Gardens. Defendant proceeded at trial under the theory that the New York
Boys were responsible for these crimes.

 -5-
 STATE V. HOWARD

 Opinion of the Court

was “kind of with them.” During his testimony, Moss stated that he saw defendant

and Doris arguing about money and drugs during the afternoon of 26 November 1991.

Defendant told Doris that she had “messed up the money” and “messed up the drugs,”

yelled “I’ll kill you,” and then walked away. Around 11:10 p.m., Moss saw defendant

and another male2 “coming around from the backside of” Doris’ apartment. The men

were carrying what looked like a television and a VCR.

 Angela Oliver (“Oliver”), who knew defendant but did not know Doris, testified

for the State and was designated a hostile witness by the trial court. Oliver testified

that she was interviewed by Detective Darryl Dowdy of the DPD (“Detective Dowdy”).

On 10 October 1992, nearly a year after the murders, Detective Dowdy—the lead

investigator on the case—received a tip that Oliver wanted to talk and he interviewed

her the same day. During her trial testimony, Oliver stated that she told the truth

to Detective Dowdy in the interview, that the interview was tape recorded, and that

a transcript of the tape was prepared. The interview transcript was admitted into

evidence and Oliver’s tape-recorded statement was played in court.

 During the interview, Oliver stated that she and defendant went to Doris’

apartment between 5:00 and 6:00 p.m. “to get [defendant’s] money or drugs,” but

Doris did not have either one. Defendant told Doris that if she did not have his money

or his drugs when he returned, he would “kill her mother----ing ass.” Sometime later,

 2 Best testified that Moss identified the male as defendant’s brother, Kenny, but at trial, Moss
claimed not to recall who the person was.

 -6-
 STATE V. HOWARD

 Opinion of the Court

between 10:00 p.m. and 1:00 a.m., defendant, his brother, Harvey, and Oliver

returned to Doris’ apartment. Doris still did not have the money or drugs, so

defendant “started jumping on her” and pushing her against the wall. Defendant

then asked Oliver to go outside because he did not want her to “be around what he

[was] fixing to do.” Before Oliver exited the apartment, she saw defendant taking

Doris upstairs. According to Oliver, “the next thing I kn[e]w, there was a lot of noise.

[Doris] was hollering and screaming[,]” saying something about Nishonda being in

the apartment. Eventually, the upstairs lights went on and “it got quiet.” At that

time, defendant’s brother entered the apartment. After defendant set a fire in the

apartment, he told his brother that “he had to burn them up. He didn’t want to leave

no evidence.” Before they left, defendant’s brother removed something from the

apartment wrapped in a sheet and sold it on the street.

 When defendant and his brother, Harvey, were taken into custody in

November 19923, Durham Fire Marshall Milton Smith (“Smith”)—who had

 3 To provide context, we briefly outline the events that led to defendant being charged in this
case. Defendant was arrested in Few Gardens around 7:30 a.m. on 27 November 1991 for trespassing
and driving with a revoked license. While defendant was in custody, he told DPD Officer R.M. Davis
that “Doris was his close friend,” and emphasized that she had killed Nishonda before killing herself.
Defendant was released later that morning; however, he was interviewed by Durham Police again
during the afternoon of the 27th. While speaking with investigators, defendant stated that Doris sold
drugs for the “Miami Boys” and claimed that he saw several individuals exiting the back of Doris’
apartment after the fire had been set. Defendant was eventually released without charge. In June
1992, defendant was admitted to the hospital after being shot five times; allegedly, New York Boys
gang members “King” and “O” were responsible for the shooting. Detective Dowdy interviewed
defendant regarding O’s involvement in two murders unrelated to defendant’s shooting. During the
interview, defendant stated that the New York Boys had murdered Doris and Nishonda. On 12

 -7-
 STATE V. HOWARD

 Opinion of the Court

investigated the fire and murder scene at Doris’ apartment—arrived at the Durham

Magistrate’s Office to complete the booking process. While Smith was collecting

information from Harvey, defendant told Smith that his brother, Kenny, not Harvey,

was with him at Few Gardens when the fire occurred. Smith then asked defendant,

“So, it was your brother Kenneth when you did this thing,” to which defendant

responded, “Yes, it was me and Kenny.” Defendant then leaned over to Smith and

added, “You are a smart mother----er, ain’t you?”

 Gwyndelyn Taylor (“Taylor”), who testified that she knew both defendant and

Doris, saw defendant at a Durham nightclub sometime between 27 November and 31

December 1991. While there, Taylor overheard someone ask defendant if he killed

Doris, to which defendant responded, “[Y]eah, I killed the bit--. The next one to get in

[my] way [I’ll] mess them up too.”

 Defendant and Natasha Mayo (“Mayo”)—defendant’s girlfriend and the

mother of his son—testified in defendant’s defense. According to Mayo, defendant

went to Doris’ apartment two days before her death, and he was looking for Mayo.

Defendant was angry to find Mayo there because Doris had encouraged Mayo and

other women to have sex with men in exchange for drugs. Mayo further testified that

on 26 November, she was with defendant while he was selling drugs out of the Few

November 1992, after multiple witnesses implicated defendant in Doris and Nishonda’s murders
during interviews with investigators, defendant and his brother were arrested. Defendant was charged
with two counts of first degree murder and one count of first degree arson. Harvey was charged only
with arson, but that charge was dropped shortly after defendant’s conviction.

 -8-
 STATE V. HOWARD

 Opinion of the Court

Gardens apartment of Sharon Bass (“Bass”). Around midnight, Bass and defendant

went to get cocaine from “the New York Boy[’s]” apartment, which was located in

Doris’ apartment building. At that time, defendant and Mayo noticed smoke coming

from Doris’ apartment so they ran back to Bass’ apartment because defendant feared

he would be cited for trespassing in Few Gardens. Mayo maintained that she and

defendant remained at Bass’ apartment for the rest of the night, smoking cocaine.

 According to defendant, Doris never sold drugs for him but she did sell drugs

for the New York Boys. Defendant acknowledged retrieving Mayo from Doris’

apartment two days before the murders because, “Doris ha[d] a habit of using other

women to get her own drugs.” He also stated that Doris did not owe him any money

or drugs at the time of her death. Defendant denied killing Doris and Nishonda and

denied setting their apartment on fire.

 Approximately five months after defendant’s trial, in August 1995, Jackson

was murdered in Brooklyn, New York, by two members of the New York Boys gang.

“Because they could not find a gun,” the two men “broke [Jackson’s] neck, doused her

with gasoline, and lit her on fire.” United States v. Celestine, 43 F. App’x 586, 589-90

(4th Cir. 2002).

 In May 1997, defendant filed a pro se MAR in Durham County Superior Court,

which was denied. Shortly thereafter, in October 1997, the North Carolina Supreme

 -9-
 STATE V. HOWARD

 Opinion of the Court

Court denied defendant’s petitions for writ of certiorari and for discretionary review.

State v. Howard, 347 N.C. 272, 493 S.E.2d 755 (1997).

 In May 2004, Moss executed a sworn affidavit recanting a prior statement that

he had given to Detective Dowdy, which was read into evidence at defendant’s trial.

Moss alleged that he was coerced by Detective Dowdy and other DPD officers to

provide a false and inaccurate statement against defendant. Moss also claimed that

he could not possibly have been in all the places described in his statement.4

 In 2009, defendant’s pro bono counsel moved the Durham County trial court to

have post-conviction DNA testing performed on Doris and Nishonda’s rape kits

pursuant to N.C. Gen. Stat. § 15A-269. The court granted defendant’s motion. Using

advanced technology, a private lab conducted testing on Doris’ vaginal swabs and

discovered a previously undetected male DNA profile. Defendant was excluded as

the source. However, a search of “CODIS,” the FBI’s national DNA database,

generated a “hit” on the profile of Jermeck Jones (“Jones”), who had lived in the Few

Gardens area as a teenager and dated Nishonda in the weeks preceding her murder,

and who was later incarcerated in Tennessee for various offenses.5 Consequently, in

late 2012, defendant’s counsel sent private investigator Jerry Waller (“Waller”) to

 4 We note that the copy of Moss’ affidavit contained in the record is essentially illegible.
However, we do not question the State’s or defendant’s representations regarding the affidavit’s
content.
 5 The lab also tested sperm found in Nishonda’s vaginal and rectal smears, which revealed a

partial male profile. Defendant was excluded as the source and the profile did not match that of Jones.
In addition, the partial profile from the unknown male was ineligible for a CODIS search.

 - 10 -
 STATE V. HOWARD

 Opinion of the Court

interview Jones. During the interview, Jones stated that he had sex with Nishonda

at a friend’s house on the night before her murder, but maintained that he had neither

met nor had sex with Doris and that he had never been to Doris and Nishonda’s

apartment. Waller reduced the content of his interview with Jones to a sworn

affidavit in September 2013.6

 After moving for post-conviction DNA testing in 2009, defendant’s counsel

received—pursuant to an open-file discovery request—the State’s entire investigative

file from the 1995 murder trial. Included in the State’s files was a police informant’s

routing slip (“the memo”), which contained information from an anonymous

informant regarding Doris and Nishonda’s murders. The memo, dated 1 December

1991, contained the following information:

 Reference Double Homicide/Arson Phew [sic] Gardens.
 Informant advised me that subjects were probably
 murdered because mother owed $8,000.00 to drug dealers
 from either Philadelphia or New York.

 Informant stated that many residents in Phew [sic]
 Gardens were offered two-thousand dollars a week for use
 of their apartment but apparently not many accepted.

 Informant further stated that perpetrators were believed
 to have left 4 bags of drugs at the apt. and apparently found
 some contents missing when they came for them.
 The perps. then told the victim/tenant she owed them
 eight-thousand dollars. When perps. came for the money
 they first raped her before strangling her. The 13 yr. old
 daughter may have unknowingly walked in on the seen

 6 The affidavit contained only Waller’s account of his interview with Jones.

 - 11 -
 STATE V. HOWARD

 Opinion of the Court

 [sic] so then killed her.

Also written in the memo’s margin was a note to Detective Dowdy from then-Durham

Police Captain E.E. Sarvis (“Captain Sarvis): “Dowdy There may be something to

this. I don’t remember any public info on the rape. EES[.]” In conjunction with the

police memo, defendant submitted the affidavit of his trial counsel, H. Wood Vann

(“Vann”), who averred that he had no “independent recollection of ever receiving or

seeing” this document, “through discovery or otherwise,” before trial. Vann also

averred that the memo was “highly exculpatory” and that it would have “eviscerate[d]

the State’s theory at trial.”

 On 19 March 2014, defendant filed a second MAR in Durham County Superior

Court. Defendant based his motion for a new trial primarily upon the grounds of

newly discovered evidence: Jackson’s murder, Moss’ recantation, the post-conviction

DNA results and Waller’s affidavit containing Jones’ statements regarding the

results, and the memo. Pursuant to our Criminal Procedure Act,

 a defendant at any time after verdict may by [an MAR],
 raise the ground that evidence is available which was
 unknown or unavailable to the defendant at the time of
 trial, which could not with due diligence have been
 discovered or made available at that time, including
 recanted testimony, and which has a direct and material
 bearing upon . . . the defendant’s guilt or innocence.

N.C. Gen. Stat. § 15A-1415(c). “This section of the statute codifies substantially the

rule previously developed by case law for the granting of a new trial for newly

 - 12 -
 STATE V. HOWARD

 Opinion of the Court

discovered evidence.” State v. Powell, 321 N.C. 364, 371, 364 S.E.2d 332, 336 (1988)

(citing State v. Beaver, 291 N.C. 137, 229 S.E.2d 179 (1976)). To prevail upon an MAR

based on the ground of newly discovered evidence, a defendant is required to establish

that:

 (1) the witness or witnesses will give newly discovered
 evidence; (2) the newly discovered evidence is probably
 true; (3) the evidence is material, competent and relevant;
 (4) due diligence was used and proper means were
 employed to procure the testimony at trial; (5) the newly
 discovered evidence is not merely cumulative or
 corroborative; (6) the new evidence does not merely tend to
 contradict, impeach or discredit the testimony of a former
 witness; and (7) the evidence is of such a nature that a
 different result will probably be reached at a new trial.

 State v. Rhodes, 366 N.C. 532, 535, 743 S.E.2d 37, 39 (2013) (citing Beaver, 291

N.C. at 143, 229 S.E.2d at 183).

 Defendant also alleged violations of his due process rights based on the State’s

failure to disclose material exculpatory evidence under Brady v. Maryland, 373 U.S.

83, 10 L. Ed. 2d 215 (1963) and the State’s presentation of false evidence under Napue

v. Illinois, 360 U.S. 264, 3 L. Ed. 2d 1217 (1959). Finally, defendant claimed that the

post-conviction DNA results were “favorable” to him pursuant to N.C. Gen. Stat. §

15A-270(c).

 The State filed a 1 May 2014 response, and moved that defendant’s MAR be

denied. Defendant replied to the State’s response on 16 May 2014. On 27 May 2014,

without conducting an evidentiary hearing, the trial court entered an order which

 - 13 -
 STATE V. HOWARD

 Opinion of the Court

granted defendant’s MAR, vacated his convictions, and granted him a new trial. The

State appeals.

 II. Analysis

 A. Appellate Jurisdiction

 As an initial matter, we must address defendant’s motion to dismiss on the

grounds that the State has no right to appeal from certain portions of the trial court’s

order. In this case, the trial court granted defendant’s MAR on three different legal

grounds: (1) newly discovered evidence, (2) constitutional violations, and (3)

“favorable” post-conviction DNA test results. The State cites State v. Peterson, 228

N.C. App. 339, 744 S.E.2d 153, review denied and review dismissed, 367 N.C. 284, 752

S.E.2d 479 (2013), for the proposition that N.C. Gen. Stat. § 15A-1445(a)(2) “provides

a means for the State to appeal an order granting [an MAR] in its entirety even

where, as here, the trial court grants the motion based upon both newly discovered

evidence and other grounds.” In response, defendant argues that, under State v.

Norman, 202 N.C. App. 329, 688 S.E.2d 512 (2010), the State has no right to appeal

an MAR granted, in part, pursuant to N.C. Gen. Stat. § 15A-270(c).7 According to

defendant, even if this Court determines that the trial court erred in granting him a

 7 Defendant also argues that the State has no right to appeal an MAR granting relief on the
ground of constitutional violations. We conclude that, under Peterson, this argument is without merit.
Our Supreme Court’s decision in State v. Stubbs also defeats this argument. 368 N.C. 40, 770 S.E.2d
74, 75 (2015) (holding that this Court had subject matter jurisdiction to review the State’s appeal from
a trial court’s order granting the defendant’s MAR, which was based on a violation of his rights under
the Eight Amendment to the U.S. Constitution).

 - 14 -
 STATE V. HOWARD

 Opinion of the Court

new trial based on newly discovered evidence, the State’s appeal under section 15A-

1445(a)(2) is futile because it cannot appeal the other bases upon which the trial court

granted defendant’s MAR. As a precautionary measure, the State filed an alternative

petition for writ of certiorari contemporaneously with its response to defendant’s

motion to dismiss. The alternative petition requested this Court to review the trial

court’s MAR order “pursuant to Rule 21 and/or Rule 2 of the North Carolina Rules of

Appellate Procedure[.]”

 Our Supreme Court has recognized that the State’s right to appeal “in a

criminal case is statutory, and statutes authorizing an appeal by the State in criminal

cases are strictly construed.” State v. Elkerson, 304 N.C. 658, 669, 285 S.E.2d 784,

791 (1982) (citations omitted). Appellate jurisdiction in criminal appeals by the State

is governed, in general, by section 15A–1445.

 In Peterson, the trial court granted the defendant’s MAR for a new trial based

on newly discovered evidence and constitutional violations. Id. at 342-43, 744 S.E.2d

at 156-57. This Court concluded that the State’s appeal was properly before it:

 Pursuant to N.C. Gen. Stat. § 15A–1445[(a)(2)], the State
 may appeal an order granting a motion for a new trial “on
 the ground of newly discovered or newly available evidence
 but only on questions of law.” Accordingly, because the
 trial court granted [the] defendant’s MAR based, in part,
 on newly discovered evidence, the State had the right to
 appeal the MAR order. We note that the State, in case we
 found that the MAR order was based solely on Brady
 violations, filed a petition for writ of certiorari. Since
 certiorari is not necessary to confer jurisdiction on this

 - 15 -
 STATE V. HOWARD

 Opinion of the Court

 Court, we dismiss the State’s petition.

Id. at 343, 744 S.E.2d at 157.

 According to defendant, however, our decision in State v. Norman precludes

the State from appealing the portion of the MAR order that was granted pursuant to

N.C. Gen. Stat. § 15A-270(c). To understand Norman’s holding, a short explanation

of our post-conviction DNA testing statutes is necessary.

 When certain criteria are met, criminal defendants in North Carolina may

move for post-conviction DNA testing of biological evidence. N.C. Gen. Stat. § 15A-

269 (2013). If a trial court denies a “defendant’s motion for DNA testing[,]” the

defendant may appeal that order. Id. § 15A-270.1. When the trial court grants a

defendant’s motion for DNA testing, it must conduct a hearing on the results. Id. §

15A–270(a) (“upon receiving the results of the DNA testing conducted under G.S.

15A-269, the court shall conduct a hearing to evaluate the results and to determine

if the results are unfavorable or favorable to the defendant.”). If the test results “are

unfavorable to the defendant, the court shall dismiss the motion . . . .” Id. § 15A-

270(b). However, if the DNA testing reveals evidence which is “favorable” to the

defendant, “the court shall enter any order that serves the interests of justice,

including [one] that . . . (1) [v]acates and sets aside the judgment[,] (2) [d]ischarges

the defendant[,] (3) [r]esentences the defendant[, or] (4) [g]rants a new trial.” Id. §

15A-270(c).

 - 16 -
 STATE V. HOWARD

 Opinion of the Court

 In Norman, the trial court granted the defendant’s motion for DNA testing and

conducted a hearing on the results, which the court determined were unfavorable to

the defendant. 202 N.C. App. at 330, 688 S.E.2d at 513-14. As a result, the

defendant’s motion was dismissed pursuant to subsection 15A-270(b). Id. at 331, 688

S.E.2d at 514. On appeal, this Court concluded that although section 15A-270.1

provided a right to appeal from the denial of a motion for DNA testing, the defendant

had no right to appeal “from an order denying relief following a hearing to evaluate

the test results.” Id. at 332, 688 S.E.2d at 515. The Norman Court presumed that

“[i]f the legislature intended to provide a right to appeal from the trial court's ruling

on the results of DNA testing, . . . it would have stated as such.” Id.

 Here, defendant contends that “the State has no more right to appeal from a

determination that the DNA results were ‘favorable’ and ordering a new trial, than

[the defendant in Norman] did from a determination that the results were

‘unfavorable.’ ” Defendant insists that even if the trial court erred in granting him a

new trial based on newly discovered evidence, he will receive a new trial anyway

because the State has no independent statutory right to appeal the portion of the

court’s MAR order granting defendant relief on the basis of favorable post-conviction

DNA tests results pursuant to subsection 15A-270(c). In other words, defendant

argues that the State’s appeal under subdivision 15A-1445(a)(2) is futile. We

disagree. In fact, defendant had no statutory right to bring his claim for relief under

 - 17 -
 STATE V. HOWARD

 Opinion of the Court

our post-conviction DNA testing statutes in his MAR.

 As noted above, defendant filed his MAR pursuant to subsection 15A-270(c)

(post-conviction DNA results), subsection 15A-1415(c) (newly discovered evidence)

and subdivision 15A-1415(b)(3) (constitutional violations based upon the newly

discovered evidence). The trial court granted him a new trial based on all of those

grounds. “According to [subsection] 15A-1415(b), a convicted criminal defendant is

entitled to seek relief from his or her convictions by means of [an MAR] filed more

than ten days after the entry of judgment on certain specifically enumerated

grounds.” State v. Harwood, 228 N.C. App. 478, 484, 746 S.E.2d 445, 449 (2013). In

Harwood, this Court recognized that because subsection 15A-1415(b)

 clearly provides that the eight specific grounds listed in
 that statutory subsection are ‘the only grounds which the
 defendant may assert by a[n MAR] made more than [ten]
 days after the entry of judgment,’ a trial court has no
 authority to grant a request for relief from a criminal
 conviction based upon a request made more than ten days
 after the entry of judgment unless the defendant’s request
 falls within one of the eight categories specified in
 [subsection] 15A-1415(b).”

Id. at 484, 746 S.E.2d at 450 (quoting N.C. Gen. Stat. § 15A-1415(b)). “For that

reason, a trial court lacks jurisdiction over the subject matter of a claim for post[-

]conviction relief which does not fall within one of the categories specified in

[subsection] 15A-1415(b).” Id. (citations omitted). Our review of subsection 15A-

1415(b) reveals that defendant’s constitutional claims were cognizable under

 - 18 -
 STATE V. HOWARD

 Opinion of the Court

subdivision 15A-1415(b)(3). Defendant was also permitted to file an MAR and seek

relief on newly discovered evidence grounds pursuant to subsection 15A–1415(c).

However, defendant’s claim requesting the trial court to grant relief pursuant to

subsection 15A-270(c) could not be brought in his MAR, which was filed well past ten

days after the entry of judgment upon his convictions. Indeed, no provision of

subsection 15A-1415(b) authorized the trial court to enter an order vacating

defendant’s original judgment and order a new trial on the basis of “favorable” post-

conviction DNA test results. In other words, the trial court did not have subject

matter jurisdiction to rule on defendant’s claim for relief under our post-conviction

DNA statutes. Consequently, that portion of the trial court’s order granting such

relief is void. State v. Daniels, 224 N.C. App. 608, 617, 741 S.E.2d 354, 361 (2012).

 This conclusion is in harmony with the fact that our Legislature has provided

a specific procedural vehicle for asserting, and obtaining relief on, claims for relief

based on post-conviction DNA testing. See N.C. Gen. Stat. §§ 15A-269, -270. That

statutory scheme has already been discussed in detail above. Defendant should have

requested relief pursuant to subsection 15A-270(c) in an independent proceeding,

separate and apart from his MAR.8 Accordingly, since all of the relief granted to

 8 Although we do not reach the merits of this appeal, if we did, nothing would preclude us from
reviewing the same post-conviction DNA test results as newly discovered evidence: the DNA test
results would be evaluated pursuant to subsection 15A-1415(c), which states the requirements that
must be met before evidence may be characterized as “newly discovered”; at the same time, we would
not apply subsection 15A-270(a)’s “favorable” or “unfavorable” analysis to the test results.

 - 19 -
 STATE V. HOWARD

 Opinion of the Court

defendant was inextricably linked to, and based on, what the court found to be newly

discovered evidence, the State properly relied on subdivision 15A-1445(a)(2) as its

ground for appellate review. Peterson, 228 N.C. App. at 343, 744 S.E.2d at 157

(holding that this Court had jurisdiction to review a trial court’s ruling on an MAR

that was based, in part, on newly discovered evidence). 9 Defendant’s motion to

dismiss is therefore denied and the State’s (alternative) petition for writ of certiorari

is dismissed, as it is unnecessary to confer jurisdiction on this Court.

 B. Evidentiary Hearing

 We now proceed to the State’s contention that the trial court erred by failing

to conduct an evidentiary hearing before granting defendant’s MAR. According to the

State, “[i]f defendant has properly supported the allegations of each claim in the MAR

with relevant, admissible, factual, proffered evidence, and each claim has merit such

that defendant would prevail on that claim if the evidence in the supporting affidavits

 9 We note that our Supreme Court has recently held that this Court “has jurisdiction to hear
an appeal by the State of an MAR when the defendant has won relief from the trial court.” Stubbs,
368 N.C. at __, 770 S.E.2d at 76. The Court also recognized that N.C. Gen. Stat. § 15A-1422(c)(3)
expressly provides that a trial court’s MAR ruling is subject to review by writ of certiorari. Id.
Accordingly, after Stubbs, Rule 21 was amended and now reads in pertinent part: “[t]he writ of
certiorari may be issued in appropriate circumstances by either appellate court to permit review . . .
pursuant to [subdivision] 15A-1422(c)(3) of an order of the trial court ruling on a motion for appropriate
relief.” N.C.R. App. P. 21(a)(1) (emphasis added). Prior to the Supreme Court’s decision in Stubbs,
Rule 21 stated in pertinent part “[t]he writ of certiorari may be issued in appropriate circumstances
by either appellate court . . . for review pursuant to [subdivision] 15A–1422(c)(3) of an order of the trial
court denying a motion for appropriate relief.” N.C.R. App. P. 21(a)(1) (2013) (emphasis added). Given
that this case is solely focused on newly discovered evidence, appellate jurisdiction must be analyzed
under subdivision 15A-1445(a)(2) rather than subdivision 15A-1422(c)(3).

 - 20 -
 STATE V. HOWARD

 Opinion of the Court

is deemed credible by the trial court after hearing the evidence from defendant’s

witnesses, then defendant has at most met the threshold showing required to obtain

an evidentiary hearing.” For the reasons that follow, we conclude that the trial court

improperly ruled on defendant’s motion without conducting an evidentiary hearing.10

 We begin by briefly explaining the general nature of MARs and the

characteristics of the order issued in the instant case. An MAR, which is created by

statute, constitutes “a motion in the original cause[,] . . . not a new proceeding.” N.C.

Gen. Stat. § 15A-1411(b) (2013). It “is a post-verdict motion (or a post-sentencing

motion where there is no verdict) made to correct errors occurring prior to, during,

and after a criminal trial.” State v. Handy, 326 N.C. 532, 535, 391 S.E.2d 159, 160-

61 (1990). Generally, all post-trial motions related to a defendant’s trial must be

brought under an MAR. N.C. Gen. Stat. § 15A-1411(c).

 Our Legislature has specifically characterized the MAR as a procedural vehicle

for defendants to challenge their convictions and sentences. Id. § 15A-1412. To that

 10 Although neither party cites this Court’s decision in State v. Stukes, 153 N.C. App. 770, 571
S.E.2d 241 (2002), we find it necessary to briefly discuss it. In Stukes, the trial court granted the
defendant’s MAR and allowed him a new trial on all charges. Id. at 773, 571 S.E.2d at 243. At the
trial level, the State “affirmatively argued against the need for an evidentiary hearing” on the
defendant’s MAR. Id. at 774, 571 S.E.2d at 244. On appeal, however, the State asserted that the trial
court’s decision not to hold such a hearing was error. Id. After concluding that the State had not
preserved the issue for review, and noting that “ ‘[a] defendant is not prejudiced by the granting of
relief which he has sought or by error resulting from his own conduct[,]’ ” this Court rejected the State’s
argument. Id. (quoting State v. Bruno, 108 N.C. App. 401, 412, 424 S.E.2d 440, 447 (1993) (citation
omitted)).
 We find that Stukes has no application to the instant case, where the State simply argued—
within the confines of the MAR statutes and applicable case law—that defendant’s motion should be
summarily denied and an evidentiary hearing was not required if the court could determine, based on
the pleadings, that the motion was without merit.

 - 21 -
 STATE V. HOWARD

 Opinion of the Court

end, North Carolina’s MAR statutes provide a mechanism to assert multiple,

different claims for post-conviction relief in one procedural device. See official

comment to id. § 15A-1411. When a defendant asserts multiple claims in an MAR,

the trial court is ultimately charged with evaluating each individual claim on the

merits and under the applicable substantive law. As a result, the trial court also sits

as the trier of fact during MAR proceedings.

 “Whether the trial court was required to afford defendant an evidentiary

hearing is primarily a question of law subject to de novo review.” State v. Marino,

229 N.C. App. 130, 140, 747 S.E.2d 633, 640 (2013) (italics added). The procedure

governing MARs is set out in N.C. Gen. Stat. § 15A-1420, and subsection (c) contains

directives regarding the trial court’s duty to hold an evidentiary hearing:

 (c) Hearings, Showing of Prejudice; Findings.

 (1) Any party is entitled to a hearing on questions of law or
 fact arising from the motion . . . unless the court determines
 that the motion is without merit. The court must determine,
 on the basis of these materials and the requirements of this
 subsection, whether an evidentiary hearing is required to
 resolve questions of fact . . . .

 (3) The court must determine the motion without an
 evidentiary hearing when the motion and supporting and
 opposing information present only questions of law . . . .

 (4) If the court cannot rule upon the motion without the
 hearing of evidence, it must conduct a hearing for the
 taking of evidence, and must make findings of fact. . . .

 - 22 -
 STATE V. HOWARD

 Opinion of the Court

N.C. Gen. Stat. § 15A-1420(c) (2015) (emphasis added). “In an evidentiary hearing

for appropriate relief where the judge sits without a jury the moving party has the

burden of proving by the preponderance of the evidence every fact to support his

motion.” State v. Adcock, 310 N.C. 1, 37, 310 S.E.2d 587, 608 (1984) (citing N.C. Gen.

Stat. § 15A-1420(c)(5)). As explained in State v. McHone, “[u]nder subsection [15A-

1420](c)(4), read in pari materia with subsections (c)(1) . . . and (c)(3), an evidentiary

hearing is required unless the motion presents assertions of fact which will entitle

the defendant to no relief even if resolved in his favor, or the motion presents only

questions of law[.]” 348 N.C. 254, 258, 499 S.E.2d 761, 763 (1998) (emphasis added). 11

 An evidentiary hearing is not automatically required before a trial court grants

a defendant’s MAR, but such a hearing is the general procedure rather than the

exception. Indeed, McHone dictates that an evidentiary hearing is mandatory unless

summary denial of an MAR is proper, or the motion presents a pure question of law.

 In the instant case, although the State denied “each and every allegation of

fact made by . . . defendant except those facts supported by the record and those

specifically admitted[,]” the trial court granted defendant’s MAR based upon

extensive findings of what it characterized as “undisputed facts.” In its lengthy MAR

order, the court routinely faulted the State for failing to present evidence in rebuttal

 11 In addition, “[a]n evidentiary hearing is not required when the motion is made in the trial
court pursuant to G.S. 15A-1414, but the court may hold an evidentiary hearing if it is appropriate to
resolve questions of fact.” N.C. Gen. Stat. § 15A-1420(c)(2). This provision does not apply here, as
defendant’s MAR was made pursuant to section 15A-1415.

 - 23 -
 STATE V. HOWARD

 Opinion of the Court

of defendant’s allegations. Implicit in the trial court’s ruling was its view that, after

all MAR materials had been received from defendant and the State, only questions of

law remained.

 As a result, the trial court treated the MAR proceeding as a burden-shifting

scheme. For example, when ruling on defendant’s Brady claim, the trial court

faulted, and even chastised, the State for failing to “tender any evidence by affidavit

or otherwise that [the memo] was produced to [defendant] or his counsel.”12 Yet the

defendant who seeks relief in an MAR “must show the existence of the asserted

ground for relief.” N.C. Gen. Stat. § 15A-1420(c)(6). By contrast, the opposing party—

here, the State—is not required to “file affidavits or other documentary evidence” or

rebut allegations contained in the motion. Id. § 15A-1420(b)(2). Defendant

nevertheless embraced the trial court’s approach at oral argument, asserting that the

State neither disputed “many material facts” nor forecasted what an evidentiary

hearing would produce. As the State suggests in its brief, the trial court’s ruling looks

more like a summary judgment, see N.C. Gen. Stat. § 1A-1, Rule 56(a), (b) (2013)

 12 The court made this finding despite record evidence that: (1) the memo was found “in a
bound package of materials that were part of the screening package,” presumably a reference to the
materials that the State allowed defendant’s trial counsel to “screen” before trial; (2) Vann’s affidavit
specified only that he had no “independent recollection” that the memo had ever been turned over; and
(3) in a 2014 interview with the Washington Post, Vann stated that while he would have “seen” and
“used” the memo had it been turned over, he could not “say ‘with 100 percent certainty’ that [the
prosecutor] never gave him the [document].” To prevail under Brady, a defendant must prove that
favorable and material evidence was “actually suppressed.” State v. Kilpatrick, 343 N.C. 466, 471, 471
S.E.2d 624, 627 (1996). In this instance, a conflict in the evidence regarding the suppression issue
arose from the record itself.

 - 24 -
 STATE V. HOWARD

 Opinion of the Court

(allowing for summary judgment by either party in a civil case), than one rendered

within the confines of our MAR statutes. See id. § 15A-1412 (“The provision in this

Article for the right to seek relief by [MAR] is procedural and is not determinative of

the question of whether the moving party is entitled to the relief sought or to other

appropriate relief.”). The State was not required to forecast evidence; defendant was

required to present evidence for the trial court’s evaluation, which he did. The court’s

evaluation of the evidence, however, was inherently flawed. We agree with the State

that as a general matter, unless an MAR presents only pure questions of law, the

motion’s principal purpose is to obtain an evidentiary hearing on a defendant’s claims

for relief.

 Our conclusion is supported by recent language from our Supreme Court in a

decision that addressed the trial court’s role at hearings on motions to suppress

evidence:

 The trial judge who presides at a suppression hearing “sees
 the witnesses, observes their demeanor as they testify and
 by reason of his more favorable position, he is given the
 responsibility of discovering the truth.” For this reason,
 our appellate courts treat findings of fact made by the trial
 court as “conclusive on appeal if they are supported by the
 evidence.” “The logic behind this approach is clear. In this
 setting, the trial judge is better able than we at the
 appellate level to gauge the comportment of the parties . . .
 and to discern the sincerity of their responses to difficult
 questions.” But a trial court is in no better position than
 an appellate court to make findings of fact if it reviews only
 the cold, written record. We therefore reject an
 interpretation of [the statutes governing suppression

 - 25 -
 STATE V. HOWARD

 Opinion of the Court

 motions] that would diminish the trial court’s institutional
 advantages in the fact-finding process.

State v. Bartlett, 368 N.C. 309, 776 S.E.2d 672, 674-75 (2015) (citations omitted).

These principles share equal application in this case, where the trial court sat as the

post-conviction trier of fact. Here, the trial court was obligated to ascertain the truth

by testing the supporting and opposing information at an evidentiary hearing where

the adversarial process could take place. Instead of doing so, the court wove its

findings together based, in part, on conjecture and, as a whole, on the cold, written

record.

 Given the nature of defendant’s asserted grounds for relief, the trial court was

required to resolve conflicting questions of fact at an evidentiary hearing. Moss’

affidavit illustrates this point. The trial court found that this recantation “by an

important witness for the State” rendered Moss’ trial testimony false and

“undermined the credibility of the State’s theory of the case.” Consequently, the court

concluded that it was newly discovered evidence.

 Pursuant to section 15A-1415(c), claims of newly discovered evidence may be

based on recanted testimony. If a new trial is to be granted on such testimony, “1)

the court [must be] reasonably well satisfied that the testimony given by a material

witness is false, and 2) there [should be] a reasonable possibility that, had the false

testimony not been admitted, a different result would have been reached at the trial.”

State v. Britt, 320 N.C. 705, 715, 360 S.E.2d 660, 665 (1987), superseded by statute on

 - 26 -
 STATE V. HOWARD

 Opinion of the Court

other grounds as stated in State v. Defoe, 364 N.C. 29, 33-38, 691 S.E.2d 1, 4-7 (2010).

 As to the first Britt requirement, the trial court’s finding that Moss’

repudiation of his pretrial statement rendered his trial testimony false is

unsupported by the evidence. The testimony given by Jackson, Davis, Oliver, and

Best, which was substantially similar to Moss’, suggests that his testimony was true

and that his recantation was not. Moss’ affidavit does not explain why it was

impossible for him to have been in all the places described in his statement.

Furthermore, the circumstances under which Moss repudiated his statement—

approximately 13 years after he gave it—are absent from the record: Did Moss recant

on his own? Did defendant’s post-conviction counsel or family members pressure

Moss to do so? Did Moss wish to avoid giving further testimony at a new trial? Has

Moss changed his tune on the recantation since executing the affidavit in 2004? This

Court has previously found that such circumstances have a direct bearing on the

veracity of a witness’s testimony. See State v. Doisey, 138 N.C. App. 620, 628, 532

S.E.2d 240, 245-46 (2000) (affirming the trial court’s denial of an MAR based on

recanted testimony because the recanting witness testified, during the second

hearing on the motion, that she repudiated her recantation and that “she signed the

affidavit after being repeatedly questioned” by friends and family members of the

defendant about the facts that led to his conviction).

 Since the trial court had no opportunity to evaluate Moss’ specific reasons for

 - 27 -
 STATE V. HOWARD

 Opinion of the Court

his recantation and his demeanor in giving that explanation, it could not properly

determine whether the recantation was genuine and whether the statement and

relevant trial testimony were false. Moss should have been questioned about whether

his recantation was truthful, or merely a product of defendant’s direction as to what

to state. Accordingly, an evidentiary hearing was required in order to assess the

truthfulness of Moss’ affidavit. See State v. Brigman, 178 N.C. App. 78, 94-95, 632

S.E.2d 498, 509 (2006) (“Based on the record before us, we cannot determine the

veracity of [the recanting witness’s] testimony. Nor can we discern whether there is

reasonable possibility that a different result would have been reached at trial had

[the witness’s] testimony at trial been different or non-existent. Accordingly, we must

remand the [MAR] based upon her alleged recantation to the trial court for an

evidentiary hearing.”).

 The record is replete with similar factual disputes, many of which the trial

court purported to resolve in its findings of fact despite the lack of an evidentiary

hearing. We will not address each one, since we are vacating the trial court’s order

and a new hearing will be held on remand followed by entry of a new order.

 All told, the trial court was presented with a broad range of post-conviction

claims based on a large and unusual constellation of conflicting evidence. Most of

defendant’s claims, and by extension, the trial court’s findings, relied heavily on

affidavits—and inferences drawn from them—for support. Resolution of those claims

 - 28 -
 STATE V. HOWARD

 Opinion of the Court

necessarily required the trial court to make credibility determinations, which could

not be done unless the evidence and witnesses were actually before the court.

Furthermore, the North Carolina Rules of Evidence apply to post-conviction

proceedings. See Adcock, 310 N.C. at 37, 310 S.E.2d at 608 (“In hearings before a

judge sitting without a jury ‘adherence to the rudimentary rules of evidence is

desirable . . . . Such adherence invites confidence in the trial judge’s findings.’ ”)

(citation omitted); State v. Foster, 222 N.C. App. 199, 202-03, 729 S.E.2d 116, 118-19

(2012) (“If we were to adopt the State’s position, then the Rules of Evidence would not

apply to . . . [MARs] in criminal cases . . . . Obviously, that cannot be the law. . . .

[Therefore,] the Rules of Evidence apply to post-conviction DNA testing motions or

proceedings.”). Some of the trial court’s findings of fact in the MAR order were based

upon evidence which the State argues was inadmissible as hearsay, hearsay within

hearsay, and third-party guilt evidence. Suffice it to say that, on remand, the trial

court should base its determinations upon only competent evidence. For the reasons

stated above, we conclude that the trial court erred by reaching the merits of

defendant’s MAR without conducting an evidentiary hearing.

 III. Conclusion

 Defendant has supported the allegations contained in his MAR with sufficient

and potentially compelling evidence. However, under no circumstances did the

information offered in support and opposition to the MAR present only undisputed

 - 29 -
 STATE V. HOWARD

 Opinion of the Court

facts and pure questions of law. Given the nature of defendant’s post-conviction

claims and the unusual collection of evidence offered in support of them, the trial

court erred in failing to conduct an evidentiary hearing and make findings on the

conflicting assertions before it granted the MAR and ordered a new trial.

 Accordingly, we vacate the trial court’s order granting defendant’s MAR and

remand for an evidentiary hearing.

 VACATED AND REMANDED FOR AN EVIDENTIARY HEARING.

 Judges STROUD and TYSON concur.

 - 30 -